*116
 
 McGEE, Chief Judge.
 

 *389
 
 The North Carolina Industrial Commission ("the Industrial Commission") found that Ms. House
 
 [1]
 
 ("Claimant") was involuntarily sterilized on 27 November 1974. The Industrial Commission based this finding in part on Claimant's testimony of 7 August 2014. Claimant testified that a Cleveland County Department of Social Services ("DSS") worker accompanied her to Cleveland Memorial Hospital in Shelby to obtain an abortion and a tubal ligation. Claimant testified:
 

 [The DSS worker] gave [the doctor] some papers to be signed, and [the doctor] asked me if I wanted to have an abortion. I said, "Yes, sir, but, no, sir," and [the doctor] asked me what I meant, and I told him that the [DSS] worker-that I couldn't keep my two daughters if I didn't have an abortion, and [the doctor] told [the DSS worker] that he could not do it under those circumstances, and so-which we went out in the hall. [The DSS worker] beat me against the wall and told me again that if I did not have this done, I would lose my two girls, and so she took me home. .... And I went home and I cried all night, and I went back the next day, and because the Department of Social Services had custody of me, I had to have the surgery done.
 

 The Industrial Commission found:
 

 4. Ms. House's medical records that were included in the record indicate that she was taken by "the Social Service people" to Cleveland Memorial Hospital in Shelby, North Carolina, in November 1974. Ms. House was nine weeks pregnant at the time. The history and physical examination note by Dr. W.J. Collins states that Ms. House ... was a "22 year old white married female ... is pregnant and desires interruption. She also requests sterilization." A subsequent medical note states that she underwent a "vaginal tubal and therapeutic D & C." This note also separately describes the procedures as "therapeutic D & C, bilateral partial salpingectomy." The procedures took place on 27 November 1974, resulting in the abortion of her nine-week old, unborn child.
 

 5. Ms. House testified that a social worker with the Department of Social Services coerced her into having the
 
 *390
 
 abortion and sterilization procedures. She testified that the social worker threatened that she couldn't keep her two living daughters if she did not have the procedures. Ms. House further testified that the social worker beat her against a wall while threatening her with the loss of her two daughters.
 

 6. A sworn and notarized letter was submitted in this matter by Barbara Neelands of Kings Mountain, North Carolina, which was received by former Deputy Commissioner Goodson and included in Ms. House's file. In this letter, Ms. Neelands states that Ms. House lived in her household from 1973 to 1975. The remaining substance of Ms. Neelands['] letter basically confirms the claims of Ms. House that a social worker ... did threaten Ms. House with losing her two daughters if she did not undergo the abortion and sterilization procedures.
 

 In 2013, the General Assembly enacted the Eugenics Asexualization and Sterilization Compensation Program ("the Compensation Program"), N.C. Gen.Stat. § 143B-426.50
 
 et seq.
 

 ,
 
 in order to provide compensation to individuals asexualized or sterilized pursuant to the North Carolina eugenics laws. The Compensation Program defined a "qualified recipient" under the Compensation Program as "[a]n individual who was asexualized involuntarily or sterilized involuntarily under the authority of the Eugenics Board of North Carolina in accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937." N.C. Gen. Stat. § 143B426.50(5) (2013).
 

 Chapter 221 of the Public Laws of 1937 related to the temporary admission of "patients" to State hospitals "for the purpose of sterilization," and is not relevant to the present appeal. 1937 N.C. Public Laws, ch. 221. Chapter 224 of the Public Laws of 1933, as amended by Chapter 463 of the Public Laws of 1935, ("the Eugenics Act"), stated in relevant part:
 

 *117
 
 Sec. 2. It shall be the
 
 duty
 
 of the board of commissioners of any county of North Carolina, at the public cost and expense, to have one of the operations described in Section 1 of this act [asexualization or sterilization] performed upon any mentally diseased, feeble-minded or epileptic resident of the county ... upon the request and petition of the superintendent of public welfare or other similar public official performing in whole or in part the functions of such superintendent, or of the next of kin,
 
 *391
 
 or the legal guardian of such mentally defective person:
 
 Provided, however,
 
 that
 
 no operation described in this section shall be lawful unless and until the provisions of this act shall be first complied with.
 

 Sec. 3. No operation under this act shall be performed by other than a duly qualified and registered North Carolina physician or surgeon, and by him only upon a written order signed after complete compliance with the procedure outlined in this act by the responsible executive head of the institution or board, or the superintendent of public welfare, or other similar official performing in whole or in part the functions of such superintendent, or the next of kin or legal guardian having custody or charge of the feebleminded, mentally defective or epileptic inmate, patient or non-institutional individual.
 

 Sec. 4..... If the person to be operated upon is not an inmate of any ... public institution, then the superintendent of welfare or such other official performing in whole or in part the functions of such superintendent of the county of which said ... non-institutional individual to be sterilized is a resident, shall be the prosecutor.
 
 It shall be the duty of such prosecutor
 
 promptly to institute proceedings as provided by this act in any or all of the following circumstances:
 

 1. When in his opinion it is for the best interest of the mental, moral or physical improvement of the ... non-institutional individual, that he or she be operated upon.
 

 2. When in his opinion it is for the public good that such ... non-institutional individual be operated upon.
 

 3. When in his opinion such ... non-institutional individual would be likely, unless operated upon, to procreate a child or children who would have a tendency to serious physical, mental, or nervous disease or deficiency.
 

 4. When requested to do so in writing by the next of kin or legal guardian of such ... non-institutional individual.
 

 ....
 

 Sec. 5. There is hereby created the Eugenics Board of North Carolina. All proceedings under this act shall be begun before the said Eugenics Board.....
 

 ....
 

 *392
 
 Sec. 8. Proceedings under this act shall be instituted by the petition of said petitioner to the Eugenics Board. Such petition shall be in writing, signed by the petitioner and duly verified by his affidavit to the best of his knowledge and belief. It shall set forth the facts of the case and the grounds of his opinion. The petition shall also contain a statement of the mental and physical status of the patient verified by the affidavit of at least one physician who has had actual knowledge of the case[.].... The prayer of said petition shall be that an order be entered by said Board authorizing the petitioner to perform, or to have performed by some competent physician or surgeon ... the operation of sterilization or asexualization as specified in Section one of this act which shall be best suited to the interests of the said ... patient or to the public good.
 

 ....
 

 Sec. 10. The said Board at the time and place named in said notice ... shall proceed to hear and consider the said petition and evidence offered in support of and against the same[.].... A stenographic transcript of the proceedings at such hearings duly certified by the petitioner and the ... individual resident, or his guardian or next of kin, or the solicitor, shall be made and preserved as part of the records of the case.
 

 *118
 
 Sec. 11. The said board may deny the prayer of the said petition or if, in the judgment of the board, the case falls within the intent and meaning of one of more of the circumstances mentioned in Section 4 of this act, and an operation of asexualization or sterilization seems to said board to be for the best interest of the mental, moral or physical improvement of the said ... individual resident or for the public good,
 
 it shall be the duty of the board to approve said recommendation
 
 in whole or in part[.]....
 

 Sec. 12..... If the ... individual resident, or the next of kin, legal guardian, solicitor of the county, and guardian appointed as herein provided, after the said hearing
 
 but not before,
 
 shall consent in writing to the operation as ordered by the board, such operation shall take place at such time as the said prosecutor petitioning shall designate.
 

 ....
 

 *393
 
 Sec. 18. Records in all cases arising under this act shall be filed permanently with the secretary of the said Eugenics Board.....
 

 1933 N.C. Public Laws, ch. 224 (some emphasis added); 1935 N.C. Public Laws, ch. 463, § 2. Unlike other state eugenics programs, "North Carolina [was] the only state that
 
 require[d]
 
 public officials, specifically directors of state institutions and county directors of social services, to petition ... for the sterilization of the mentally disabled." Joe Zumpano-Canto,
 
 Nonconsensual Sterilization of the Mentally Disabled in North Carolina: An Ethics Critique of the Statutory Standard and Its Judicial Interpretation,
 
 13 Journal of Contemporary Health Law & Policy, Issue 1, 84 (1996) (emphasis added).
 

 Claimant was involuntarily sterilized on 27 November 1974. At that time, there were two statutes authorizing sterilization of individuals in Claimant's position: (1) N.C. Gen.Stat. § 90-271 and (2) N.C. Gen.Stat. § 35-37.
 

 N.C. Gen.Stat. §§ 90-271, which is still in effect, authorized the
 
 voluntary
 
 sterilization of adults or married juveniles, provided a written request was
 

 made by such person prior to the performance of such surgical operation, and provided, further, that prior to or at the time of such request a full and reasonable medical explanation is given by such physician or surgeon to such person as to the meaning and consequences of such operation[.]
 

 N.C. Gen.Stat. § 90-271 (2013). This legislation was entitled, in part, "An Act to Make it Clear that Physicians and Surgeons are Authorized to Perform Certain Operations upon the Reproductive Organs of Certain Persons when Requested to do so[.]" 1963 N.C. Sess. Laws, ch. 600. The purpose of that act, in part, was to provide statutory protections for physicians who sterilized
 
 consenting
 
 adults. In order to operate within the requirements of N.C. Gen.Stat. § 90-271, the consent had to be informed, willing, and in writing. In the matter before us, there is no record evidence of written consent for the operation performed. Further, the Industrial Commission found as fact that the sterilization in this case was involuntary.
 

 The only other statute that was in effect in 1974 authorizing sterilization of adults in situations similar to that of Claimant was
 
 *394
 
 N.C. Gen.Stat. § 35-37. This statute allowed the
 
 involuntary
 
 sterilization of non-institutionalized people in certain circumstances. N.C. Gen.Stat. § 35-37 was the general statute successor to Section 2 of Chapter 224 of the Public Laws of 1933. At the time that Claimant was involuntarily sterilized, N.C. Gen.Stat. § 35-37 had been amended to read as follows:
 

 Operations on Mental Defectives Not in Institutions. It shall be the duty of the board of commissioners of any county of North Carolina, at the public cost and expense, to have one of the operations described in § 35-36, performed upon any mentally diseased or feeble-minded resident of the county, not an inmate of any public institution, upon the request and petition of the director of [social services] or other similar public official performing in whole or in part the functions of such director, or of the next of kin, or the legal guardian of such mentally defective person: Provided, however, that no operation described in this Section shall be lawful unless and until the provisions of this Article shall be first complied with.
 

 *119
 
 N.C. Gen.Stat. § 35-37 (1973) ; 1967 N.C. Sess. Laws, ch. 138, § 2. N.C. Gen.Stat. § 35-36 was also amended in 1967 and defined the relevant "operations" as follows: "[A]sexualization, or sterilization, performed upon any mentally diseased or feebleminded [individual], as may be considered best in the interest of the mental, moral, or physical improvement of the [individual], or for the public good[.]" N.C. Gen.Stat. § 35-36 (1973) ; 1967 N.C. Sess. Laws, ch. 138, § 1. N.C. Gen.Stat. § 35-38 was amended in 1967 to the following:
 

 Restrictions on Such Operations. No operation under this Article shall be performed by other than a duly qualified and registered North Carolina physician or surgeon, and by him only upon a written order signed after complete compliance with the procedure outlined in this Article by the responsible executive head of the institution or board, or the director of social services, or other similar official performing in whole or in part the functions of such director, or the next of kin or legal guardian having custody or charge of the feeble-minded or mentally defective inmate, patient or non-institutional individual.
 

 N.C. Gen.Stat. § 35-38 (1973) ;
 
 1967 N.C. Sess. Laws 138
 
 , § 3. N.C. Gen.Stat. § 35-39 stated in relevant part:
 

 *395
 
 If the person to be operated upon is not an inmate of any ... public institution, then the director of social services or such other official performing in whole or in part the functions of such director of the county of which said ... non-institutional individual to be sterilized is a resident, shall be the prosecutor.
 

 It shall be the duty of such prosecutor promptly to institute proceedings as provided by this Article in any of the following circumstances:
 

 1. When in his opinion it is for the best interest of the mental, moral or physical improvement of the ... non-institutional individual, that he or she be operated upon.
 

 2. When in his opinion it is for the public good that such ... non-institutional individual be operated upon.
 

 3. When in his opinion such ... non-institutional individual would be likely, unless operated upon, to procreate a child or children who would have a tendency to serious physical, mental, or nervous disease or deficiency.
 

 4. When requested to do so in writing by the next of kin or legal guardian of such ... non-institutional individual.
 

 N.C. Gen.Stat. § 35-39 (1973). According to N.C. Gen.Stat. § 35-43 : "Proceedings under this article shall be instituted by the petition of said petitioner to the Eugenics [Board].
 
 [2]
 
 Such petition shall be in writing, signed by the petitioner and duly verified by his affidavit to the best of his knowledge and belief." N.C. Gen.Stat. § 35-43 (1973). Further, the Eugenics Act required that
 

 [a] copy of said petition, duly certified by the Secretary of Human Resources to be correct, must be served upon the ... individual resident, together with a notice in writing signed by the Secretary of Human Resources designating the time and place not less than 20 days before the presentation of such petition to said Eugenics [Board] when and where said [Board] will hear and pass upon such petition.
 

 *396
 
 N.C. Gen.Stat. § 35-44 (1973). Following the hearing before the Eugenics Board,
 

 [t]he ... [Board] may deny the prayer of the said petition or if in the judgment of the [Board], the case falls within the intent and meaning of one of more of the circumstances mentioned in 35-39, and an operation of asexualization or sterilization seems to said [Board] to be for the best interest of the mental, moral or physical improvement of the said ... individual resident or for the public good, it shall be the duty of the [Board] to approve said recommendation in whole or in part[.]
 

 N.C. Gen.Stat. § 35-46 (1973). All records related to cases that arose pursuant to the
 
 *120
 
 Act were required to be preserved permanently. N.C. Gen.Stat. § 35-53 (1973).
 

 Because Claimant was
 
 involuntarily
 
 sterilized, the only legislation in effect at the time authorizing Claimant's sterilization was the Eugenics Act. As clearly stated by the Eugenics Act, "no operation described in this Section shall be lawful unless and until the provisions of this Article shall be first complied with." N.C. Gen.Stat. § 35-37 (1973). However, there is no evidence that the provisions of the Eugenics Act were complied with prior to the involuntary sterilization of Claimant. For example, the record contains no petition to the Eugenics Board by anyone requesting the involuntary sterilization of Claimant. There is no indication that any notice was given or hearing conducted, or that any order authorizing Claimant's sterilization was ever entered.
 
 See
 
 N.C. Gen.Stat. §§ 35-37, 35-39, 35-43, 35-44, 35-45, 35-46, 35-47 and 35-53 (1973). Though the Industrial Commission, implicitly at least, found that Claimant's involuntary sterilization was carried out at the instigation of DSS, because DSS failed to follow the then existing law in pursuing Claimant's involuntary sterilization, we are left to determine whether Claimant is entitled to compensation from the Compensation Program as "[a]n individual who was asexualized involuntarily or sterilized involuntarily under the authority of the Eugenics Board of North Carolina in accordance with Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937." N.C. Gen.Stat. § 143B-426.50(5).
 

 Although it is possible that members of the General Assembly were unaware at the time that N.C. Gen.Stat. § 143B-426.50(5) was enacted that many involuntary sterilizations had been conducted outside the parameters of the Eugenics Act-and thus had been conducted without legal authority-we are constrained to apply the plain meaning of
 
 *397
 
 N.C. Gen.Stat. § 143B-426.50(5) unless we determine its language is ambiguous. We hold the language of N.C. Gen.Stat. § 143B-426.50(5) is clear and without ambiguity.
 

 Statutory interpretation properly begins with an examination of the plain words of the statute. The legislative purpose of a statute is first ascertained by examining the statute's plain language. "When the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give it its plain and definite meaning."
 

 Correll v. Division of Social Services,
 

 332 N.C. 141
 
 , 144,
 
 418 S.E.2d 232
 
 , 235 (1992). We cannot make any holding contrary to the clear meaning of N.C. Gen. Stat. § 143B426.50(5). We must consider the words of the statute as they appear. N.C. Gen.Stat. § 143B-426.50(5) sets forth two requirements that must be proven before a claimant may be considered a qualified recipient: (1) the claimant must have been involuntarily sterilized "under the authority of the Eugenics Board of North Carolina," and (2) the claimant must have been involuntarily sterilized in accordance with the procedures as set forth in "Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937." N.C. Gen.Stat. § 143B-426.50(5). In the present case, unfortunately, Claimant cannot show that either of these requirements has been met.
 

 There is no record evidence that the Eugenics Board was ever informed of Claimant's involuntary sterilization, nor that it was consulted in the matter in any way. Because the language of N.C. Gen.Stat. § 143B-426.50(5) is clear, "there is no room for judicial construction, and [this Court] must give it its plain and definite meaning."
 
 Correll,
 

 332 N.C. at 144
 
 ,
 
 418 S.E.2d at 235
 
 . Further, all the evidence in this matter clearly demonstrates that Claimant's involuntary sterilization was performed without adherence to the requirements set forth in "Chapter 224 of the Public Laws of 1933 or Chapter 221 of the Public Laws of 1937." N.C. Gen.Stat. § 143B-426.50(5). Therefore, we must affirm.
 

 AFFIRMED.
 

 Judges DILLON and DAVIS concur.
 

 [1]
 

 We avoid using the full name of Claimant in order to protect her anonymity.
 

 [2]
 

 The Eugenics Act was amended effective 1 July 1973 to replace the term "Eugenics Board" with the term "Eugenics Commission."
 
 1973 N.C. Sess. Laws 476
 
 , § 133.3. For consistency, we shall always refer to this entity as the "Eugenics Board."